## STANDARD PAINT CO. v. BIRD et al.

### (Circuit Court, D. New Jersey. June 23, 1894.)

**1. PATENTS—MALTHA COATED PAPER—INFRINGEMENT.**
The Pearce and Beardsley patent No. 378,520, a new article of manufacture and commerce, consisting of paper coated or saturated with maltha, as therein set forth, the substance called "maltha," and used by the patentees, being described in the specifications of the patent as the solid residuum obtained in the distillation of the heavier grades of petroleum, is infringed by defendant's use of "petrocite," which is the same thing as the patentees' maltha, though it is obtained from other substances than that which they mentioned, and though the patentees were ignorant that it was so obtainable.

**2. SAME—ANTICIPATION.**
Though said patent could not, in view of the prior state of the art, be sustained as for the use of any kind of bituminous material whatever, its claim being limited to the maltha particularly described, and this having never before been used for the purpose for which patentees used it, the patent is valid.

**3. SAME—INJUNCTION.**
In a suit against R. and B. for infringement of a patent for paper coated with maltha, it appearing that R. rented part of his factory to B., and that B. coated the paper; that R. manufactured and sold to B. all the paper which was to be coated by B.; that R. got an extra price for his paper to compensate him for looking after the filling of orders for B., and supplying money for and paying off B.'s help, when B. was away,—injunction will issue against both, though when it comes to an accounting complainant must prove that R. is liable to him in profits or damages, under risk of what the court may possibly order concerning costs.

Suit by the Standard Paint Company against Bird and others for infringement of patent.

Willard Parker Butler, for complainant.
Thadias B. Wakeman, for defendants.

DALLAS, Circuit Judge. This suit is brought upon patent No. 378,520, granted to Truman J. Pearce and Melvin W. Beardsley, assignors, etc., the sole claim whereof is as follows: "As a new article of manufacture and of commerce, paper coated or saturated with maltha, substantially as herein set forth." Several of the de-

fenses suggested by the record, though considered, need not be separately discussed. No brief on behalf of the defendants was furnished until a considerable time after the hearing. Such postponements are not unusual, but are very unsatisfactory. The argument of 82 printed pages, which has now been submitted, may, however, be safely accepted as finally presenting and enforcing the grounds of defense which are relied upon. For this reason, and because they clearly present what seem to be the real questions in the cause, I will deal only with the two propositions which are affirmed in the defendants' brief, as follows:

"Our position is twofold: (1) That complainant's patent covers only the use of the 'maltha,' as defined and described, and is restricted thereto; and that said maltha is not an ingredient used by Bird. (2) That, if it be held to include the said ingredients used by Bird, it is unsustainable and void, as neither new, nor useful, nor properly and lawfully granted."

The first limb of the first of these propositions may be granted. To state it somewhat differently, the complainant's patent is for the article of manufacture claimed, when produced by coating or saturating paper with "maltha," as defined. But how is the "maltha" referred to defined? The correct answer to this question must be sought at the threshold of the case; but it is not hard to find. It is manifest from the evidence that the patentees employed this term without possessing exact knowledge of its meaning, and the counsel who prepared their application appears to have doubted the propriety of using it to designate the substance which was in contemplation. But there is no reason to suspect that any inexactness in this matter was intentional, or was resorted to for the purpose of deception; and, in fact, no person has been misled by it. Under these circumstances, the meaning of the word "maltha" may fairly and justly be taken to be that which the patentees attached to it when they adopted it, and that meaning appears from the history of the invention, and, especially, in the specification of the patent in suit, where it is said:

"The product and substance known as 'maltha,' which we employ and utilize in the manufacture of our improved paper, is the solid residuum obtained in the distillation of the heavier grades of petroleum, and, as procured from oil refineries in many localities, it is sufficiently free from earthy and other foreign solid matter to be used without any preparatory treatment; but, where it is found and procured in a more or less unclean condition, it is necessary to eliminate the sand and other impurities mixed with it before it is suitable for this purpose."

Resort being had to this description of the substance intended, all difficulty arising from the inapt use of the name "maltha" in the claim is removed, for the latter may be read as if the defining language of the specification was contained in the claim itself. By doing this the claim is neither added to nor subtracted from. It is explained by interpretation of its language in accordance with the true intent of the patentees, as expressed in another part of the same instrument. Reference to the specification for such a purpose is not objectionable, and in this case it renders unimportant the expert

testimony which has been taken for the purpose of showing what would be generally understood to be "maltha" by those who are well instructed with respect to the true sense of that term. Now, it being conceded that the patent covers only the use of the substance thus defined, regardless of the name by which it should be designated, the defendants insist that the claim is, in consequence, so restricted as not to be inclusive of "an ingredient used by Bird"; but the ingenious argument of counsel in support of this contention is not convincing. Mr. Bird, it appears, employs a material which is known as "petrocite." He adds to it certain other substances, but the petrocite is the essential component of his mixture, and by its use he produces the complainant's patented article. Much expert testimony has been adduced upon, and the arguments have been largely directed to, the question of identity of petrocite with the maltha of the patent; but it is unnecessary to particularly refer to this evidence, or to attempt a review of the publications which have been cited in connection with it. It is sufficient to say that, upon careful consideration of the whole matter, I have arrived at the conclusion that petrocite and maltha, as described by the patentees, are the same thing. They are not produced in precisely, though they are in substantially, the same manner; and the defendants' "solid residuum" is obtained, not "in the distillation of the heavier grades of petroleum," but from the lighter grades of the oil regions of the eastern portion of the United States. Yet, as has been said, the products, however and from whatever produced, are the same, and, by the use of either, the same manufactured article is created; and this, in the sense of the patent law, constitutes identity. It is still urged, however, that the patentees had no knowledge of petrocite; that they described the residuum they had in mind as that which is obtained in the distillation of the heavier grades of petroleum, and that therefore they should be held to be restricted to a residuum so obtained. I am unable to assent to this. It may well be that the patentees were ignorant of the fact that the material which they referred to was obtainable from other substances than that which they mentioned, but such ignorance does not have the supposed restrictive consequence. The material itself, not the substance from which it may be obtained, is the gist of the matter, and "a patented manufacture is infringed by the making, use, or sale of any manufacture which possesses the same essential characteristics."

The proposition that the views which have been expressed with respect to the scope of the patent in suit require that it should be held to be "unsustainable and void" involves, I think, a misconception of the construction which has been adopted. Investigation of the prior state of the art, as shown by this record, does disclose that the patent now in question could not be sustained as for the use of any kind of bituminous material whatever; but the claim, as I have interpreted it, is limited to the solid residuum particularly described. It is because the defendants have used this same material that they have infringed; and it is because it had never been used before as and for the purpose for which the patentees employed it that the

patent which they obtained is impregnable to assault on the ground of anticipation.

The learned counsel of the defendants has suggested that "this suit should be dismissed as to the defendant Reynolds," because, as is averred in the amended answer, he "has no interest in said business, except as a creditor, landlord, and keeper, and he denies that he ever sold or manufactured paper, as is alleged as to him in said bill of complaint." Mr. Reynolds' connection with the infringing business seems, however, to have been closer and more extensive than this language indicates. This appears from his whole testimony, but the following extract from it will suffice to explain what the character of his participation in the production and sale of the infringing paper really was:

"XQ. 28. Did Mr. Bird begin to manufacture paper at this factory as soon as the machinery was up? A. He commenced to coat it. XQ. 29. Was all the paper which was coated by Mr. Bird, at the factory which you rented him, from the time that the machinery was first put up, made by you? A. Yes, sir. XQ. 30. Mr. Bird was frequently absent, was he not, on business trips? A. Yes, sir. XQ. 31. Did you ever go into that part of the factory occupied by him during his absence? Yes, sir. XQ. 32. Ever give any instruction to anybody there? A. Not as far as coating paper. XQ. 33. But as far as what did you give instructions? A. For instance, I made the men put it on the trucks, and shipped it. XQ. 34. Why did you do that? A. If a man sends me an order, I ship it. XQ. 35. Then, as I understand, it was still your habit, in the part of the factory rented by you to Mr. Bird, to ship paper for his account, which had previously been coated by him. A. Yes. XQ. 36. What other thing have you done in that part of the factory that you rented to Mr. Bird, at any time after this machinery was set up? A. Nothing to speak of. XQ. 37. Who paid off the men when Mr. Bird was gone? A. That arrangement was made with me to pay the men, and charge it to him. XQ. 38. Who supplied the money for that? A. I did; the same as I supplied the paper. XQ. 39. Was any paper coated while Mr. Bird was gone? A. Yes. XQ. 40. Who attended to that? A. He had a man there to attend to business. XQ. 41. Did you ever give that man any instructions of any sort? A. No. XQ. 42. Did you ever supply any money for any other purpose than for paying wages while Mr. Bird was gone? A. No. XQ. 43. Who paid for any coating material that came while Mr. Bird was gone? A. I might have paid for some of it, but most of it was left until he came, and he settled it himself. XQ. 44. Now, did you ever sell any coated paper while Mr. Bird was gone? A. I never solicited an order. XQ. 45. (Question repeated.) A. If parties came there, I gave them the price, and I believe one party bought some. XQ. 46. Did that party pay the money to you? A. Yes. XQ. 47. Did you fill any orders for Mr. Bird that came in while he was gone? A. Yes. XQ. 48. From the very commencement of his coating paper? A. Yes. XQ. 49. Did you take the money that came in during Mr. Bird's absence from orders that had been filled? A. Yes. XQ. 50. I understand that you took, at the commencement of the operation with H. J. Bird & Co., all the receipts of the firm from the sales of coated paper, for the purpose of protecting yourself in some manner. Is that correct? A. It was for my own benefit to pay for the paper and the help that I gave. XQ. 51. What did you charge Mr. Bird for looking after his business while he was gone? A. That was made in the price of paper. He was to pay me so much for the paper, and I was to see it shipped. XQ. 52. Then, as I understand you, you gave Mr. Bird a price which covered you for the additional labor and trouble that you were put to in looking out for his business while he was away? A. Yes. XQ. 53. Did you figure the paper for Mr. Bird at a larger price than you figured it to other customers, for the purpose of compensating yourself in this way? A. Yes. XQ. 54. Did you sell more paper or less paper during the year after Mr. Bird began to coat

paper than you had done the year before? A. I have always sold the whole capacity of my mill, even before I saw Bird. XQ. 55. But you sold, after he began operations, the full capacity, at somewhat better price to yourself, did you not? A. Yes."

The facts do not, in my opinion, call for the dismissal of the bill as to the defendant Reynolds; but it is not impossible that it may hereafter appear that the following remarks, made by the court in Starrett v. Machine Co., infra, are pertinent to this case. Judge Lowell there said:

"I think an injunction should go against all the defendants; but, when it comes to the accounting, the plaintiff must prove before the master that the company is liable to him in profits or damages, under risk of what the court may order concerning costs." 14 Fed. 910; Jennings v. Dolan, 29 Fed. 861; Jackson v. Nagle, 47 Fed. 703.

A decree for the plaintiff, in the usual form, will be entered.